EDWARD P. SUTER, Trustee *vs.* A. M. IVES, and others, trading as THE IVES MANUFACTURING COMPANY.

A. M. IVES, and others, trading as THE IVES MANUFACTURING COMPANY *vs.* EDWARD P. SUTER, Trustee.

### MORTGAGES.

*Trust Estates—Trustee dealing with trust estate as his own— Validity of mortgage of such estate by trustee—Defence to suit for foreclosure of such mortgage—Proof that mortgaged property belongs to trust estate—Character of evidence required—Construction of Mortgages—Application of credits.*

In 1860, by a decree of the Circuit Court for Baltimore County, in Equity, a certain Andrew J. Myers was appointed trustee of the estate of Edward Griffith, then late of said county, deceased, and as such trustee came into the possession of a valuable real and personal estate. He immediately began to use the property as his own, disposing of parts thereof from time to time, and investing the proceeds in other property, the title to which he took in his own name. In 1875, Henry S. Myers, a son of Andrew J., and Thomas F. Eigelberner, were conducting the business of dealers in plumbers' materials, &c., under the firm name of Eigelberner & Co. They purchased goods of the Ives Manufacturing Co., of New York State, under a contract made October 23rd, 1875, to continue for five years from January 1st, 1876, and by an agreement of the same date, annexed to said contract, A. J. Myers agreed to guarantee the contract on the part of Eigelberner & Co., and also to give to said Ives Manufacturing Co., a mortgage as a continuing collateral security.

In pursuance of this agreement he gave to said company, on the 24th of January, 1876, a mortgage on a lot of ground which, it is claimed, belonged to the trust estate, but which stood in his name on the Land Records of Baltimore City. The questions in this case are:

1st. Is the mortgaged property responsible to any extent for these engagements on the part of A. J. Myers?

2nd. If so, to what extent? HELD:

1st. That the first thing to be done by him who sets up this defence to the mortgage claim against the property is to establish by clear and satisfactory proof that the money belonging to the trust estate has been invested in this property. If there is a failure of proof on this point, it is needless to inquire whether there are any other valid objections to the claim.

2nd. Where the only proof adduced in support of such a position is a statement made by the trustee in his report to the Court to the effect that he had invested $10,000 cash belonging to the trust estate in this property, and this statement is met by a letter of the same trustee in which is contained an explicit and positive assertion of individual ownership of the same property, it is plain the tracing of the trust funds into this property is not made out by such proof as the law requires.

3rd. The *extent* of the liability depends upon the construction of the mortgage itself. It plainly appears that the mortgage was given *as collateral security for the guaranty* of Myers endorsed on the contract of October 23, 1875. This guaranty which the mortgage secures is, by its terms, confined to the stipulations of the contract, and as the latter was not to take effect till the first of January, 1876, it follows that the mortgage covers only the dealings which took place between the firm and the company *after that date.*

Credits growing out of and springing from a contract itself, do not fall within the rule requiring credits to be applied to the antecedent unsecured indebtedness, or to the first items of debit in an account between the parties, like payments of money on account, but may properly be applied to the payment of indebtedness arising out of the contract from which they spring.

APPEALS from the Circuit Court for Baltimore City.

A certain Thomas F. Eigelberner and Henry S. Myers, a son of Andrew J. Myers, formed a co-partnership, conducting the business of dealers in plumbers' hardware, materials, &c., and as such firm they entered into negotiations, through A. J. Myers, with the Ives Manufacturing Company, of Medina, New York, to purchase from it plumbers' materials, &c.

It agreed to sell to said firm, with the understanding that Andrew J. Myers should guarantee the contract, and

endorse the notes of Eigelberner & Co., and should also execute a mortgage as collateral security to secure his endorsements and guaranty. Subsequently a written contract was entered into, dated 23rd October, 1875, under which goods were sold and delivered to Eigelberner & Co., to the amount of $7712, upon which there were credits amounting to $846.31. At the time of the making of the contract the guaranty of A. J. Myers was endorsed thereon, and in addition to the guaranty, he also agreed to endorse all notes made by said Eigelberner & Co. to said company, pursuant to the aforegoing agreement.

Eigelberner & Co., made and delivered to said company their promissory notes, as follows: one for $1,000, dated December 1st, 1875, one for $2000, dated December 31st, 1875, and one for $5000, dated February 2nd, 1876, all drawn at five months, and all of them endorsed by Andrew J. Myers. The execution of the mortgage was delayed by Myers from time to time under various excuses, until the 14th day of January, 1876, when a mortgage was executed by Myers and wife, upon a lot of ground at the corner of Monument and Washington streets, in Baltimore City, reciting, "that whereas the said *Andrew J. Myers,* in pursuance of the terms of a certain contract or agreement entered into by him with said company, (said agreement being annexed to a contract entered into between said company and Eigelberner & Co., on the 23rd October, 1875,) *did agree* to execute these presents as a continuing collateral security, (to be limited in the aggregate to the amount of twenty thousand dollars,) for the performance on the part of the said Andrew J. Myers, of all the covenants and agreements in said contract between him and said company, *and also as collateral security for the payment as stipulated by said contract of any and all notes, drafts, acceptances, or other obligations signed or endorsed by said Andrew J. Myers, and held, owned or negotiated by said Ives Manufacturing Company,"* the lia-

bility of the property being limited to $20,000, and " in consideration of the premises," this conveyance is made. The notes given to said company having been protested, it did, on the 3rd day of April, 1876, apply to the Circuit Court of Baltimore City, for a decree to sell the property described in the mortgage from A. J. Myers; and the Court on the same day passed the decree, as prayed.

Afterwards on the 26th day of April, 1876, a certain Edward P. Suter filed a petition in this case in which he alleged, that in the year 1860, by virtue of a proceeding in the Circuit Court for Baltimore County wherein Andrew J. Myers, *et al.*, were complainants, and Henry S. Myers, *et al.*, were defendants, a certain Andrew J. Myers, one of the defendants in this case, was appointed trustee of the estate of Edward Griffith, late of said County, deceased: that as such trustee he came into the possession of a valuable estate, and immediately began to use the property of his *cestui que trust* as though it were his own, disposing from time to time of parts of the trust estate and investing the proceeds thereof in property the title to which he took in his own name: that among other property so acquired by him was a lot of ground in Baltimore City, situated on the corner of Monument and Washington streets, which is the same lot of ground particularly described in the mortgage from said Andrew J. Myers and wife, to the Ives Manufacturing Company.

The petition then sets out the contract of Andrew J. Myers with the said Ives Manufacturing Company, and alleges that the property described in said mortgage is a part of the said trust estate, and that the said company had full knowledge of that fact at the time of the execution of said mortgage.

It then sets out the insolvency of Myers, and the manner of the appointment of the petitioner as trustee in his stead, and also alleges that the property so belonging to the trust estate as aforesaid has been advertised for sale,

upon the default of the mortgagors and pursuant to the decree of the Court passed in the premises.

It also alleges that many of the charges in the claim of the complainant are long anterior to the date of the mortgage and contract, and not intended to be secured by the mortgage and that said property is not responsible therefor, and offers to bring into Court the amount that might be ascertained to be due.

Upon this petition the Court passed an order suspending the sale of the mortgaged property, so alleged to belong to the said trust estate and referring the papers to the auditor to state an account.

To this petition the complainant filed its answer, denying all knowledge of the trust set up by the petitioner; alleging that the property described in said mortgage stood in the name of Andrew J. Myers on the Land Records of Baltimore City, and denying that at, before or since the execution of said mortgage, they had any knowledge that the property described therein was purchased with the trust funds of the estate of Edward Griffith.

The papers having been referred to the auditor, a large amount of testimony was taken before him, which he returned into Court with two accounts, one representing the view of the complainant, by which it appeared that the defendant, Myers, was indebted to it in the sum of $6742.89; the other representing the view of the defendant, by which it appeared that he was indebted to the complainant in the sum of $291.44. Exceptions were filed both by the complainants and by the petitioner to the accounts so stated, and after hearing the exceptions, the Court filed an opinion in reference to the construction of the contract and mortgage, and in accordance with this opinion the auditor stated another account, showing a balance due the complainants of $2635.32.

Before the time for final ratification of the account so stated by the auditor, the petitioner filed a petition asking that the papers be remanded to the auditor to state another

account, so that he might prove the claim of complainants as filed in bankruptcy against the estate of Eigelberner & Co., and also the payment by the assignee of $1409.92, on account thereof.

The auditor then stated another account, showing a balance of $1999.66 due the complainants.

The following is the account.

The Mortgaged Estate of T. F. Eigelberner & Co.,

       In acct. with the Ives' Manufacturing Co. DR.

1876.

Jany. 1. To this amount, being the aggregate of the items of "mdse.," purchased by the defendants from the complainant after and since Jany. 1, 1876, and which are particularized in auditor's account filed March 9, 1877 ......................................... $2,948 36

                CRS.

By amount of profit, &c., due T. F. Eigelberner & Co., and allowed in the auditor's account, fd. March 9, 1877..............................$288 89

" Amount of "mdse." returned and credited in the same account ........ 40 86

" Amount of credits of freight, per same account............................ 102 37

By this amount, being the proper proportion of the dividend received by the complainants on their whole claim from Henry McShane, the assignee in bankruptcy of T. F. Eigelberner & Co., per the agreement of counsel filed in the cause.. 516 58
                                   948 70

This net balance due the complainants by the defendants, per this account...............$1,999 66

To this account of the auditor, the petitioner, Suter, filed the following exception:

Because said account charges the mortgage estate with goods furnished to Eigelberner & Co., between January 1st, and the date of the execution of the said mortgage, to wit, on the 14th day of January, 1876, whereas, said mortgaged property being in fact the property not of A. J. Myers, but of the devisees of Edward Griffith, cannot be made answerable for any other or greater debt than that contracted after the execution and recording of said mortgage, and subject to such credits as can be established applicable to said charges.

The complainant also excepted to this account and filed therefore the following reasons:

1st. Because the same does not allow the claim of the complainants.

2nd. Because the said auditor by said account has credited on the amount of merchandise furnished since January 1st, 1876, moneys that should be credited on account of debit items in the account of complainants.

The Court passed an order overruling the exceptions filed by the complainant and petitioner to the auditor's account last filed and ratified the same.

From this order both the complainants and the petitioner appealed.

The cause was argued before BARTOL, C. J., BOWIE, MILLER, ALVEY and ROBINSON, J.

*Samuel Snowden,* for the Ives Manufacturing Co.

1. By the true construction of the contract between the Ives Manufacturing Company and Eigelberner & Co , it went into operation from the day of its date, October 23, 1875, and the provision of "*five years*" from January 1, 1876, was intended as the limitation of the time during which the said contract should remain in force, but has

Suter, Trustee *vs.* Ives, *et al.*  Same *vs.* Same.

no relation to the period of its commencement, which is fixed by its date.

In construing the contract, the Court must look at its subject-matter, the situation of the parties and the object intended to be effected, with the view to discover the sense in which any terms are used. *Salmon Falls Co. vs. Portsmouth Co.*, 46 *N. H.*, 249.

The firm of Eigelberner & Co. commenced immediately to order goods in large quantities.    Notes were given every month endorsed by Andrew J. Myers.    Freights were charged to the Ives Manufacturing Co., in accordance with a provision in the contract.

In all these acts the minds of the parties met, and shew plainly that the contract was understood by both parties as in force and operation from the day of its date.    The day of its date was, therefore, clearly the commencment of the contract, and the term of five years from the first day of January, 1876, fixes the time of the limitation of its continuance.

This was fixed by the contract itself, and could not be changed by the parol evidence as to the time of its commencment. *Bladen vs. Wells*, 30 *Md.*, 577.    Nor by the letters of the parties. *Mills vs. Matthews*, 7 *Md.*, 315 ; *Key vs. Parnham*, 6 *H. & J.*, 418.

The contract is to be construed by its own terms, and by the *acts* of the parties thereunder, and cannot be construed by the *spoken* or *written* language of any of the parties thereto.

If the Ives Manufacturing Company is correct on this point, the mortgage covers the whole amount of the mortgagee's claim and the account stated for them by the auditor, less the amount since received from the assignee in bankruptcy, should have been allowed by the Court below.

2. If, however, the time for the delivery of goods under the contract did not commence until the first day of

January, 1876, yet the terms of the mortgage cover all *notes, drafts, acceptances or other obligations signed or endorsed by said Myers, and held, owned or negotiated by said Ives Manufacturing Company;* and the whole of the Ives Manufacturing Company's claim being upon notes *signed or endorsed by Myers,* are secured by said mortgage, and give the mortgagees a lien on the property therein described for the whole amount owing to them upon such notes.   The recital in the mortgage is not wholly correct, for the guaranty endorsed upon the contract did not stipulate that a mortgage should be given as collateral security, &c., but this was the parol agreement made at the date of the contract, and to this the scrivener, in drawing the mortgage, must have referred ; and as the mortgage was prepared under the direction of Myers, and the mortgagee, upon the faith of the agreement to give it, had parted with its property, a construction should be given to the instrument favorable to the company.   *Noonan vs. Bradley,* 9 *Wall.,* 394.

The correspondence all shows that Myers knew that notes had been executed, endorsed by himself in pursuance of his contract of guaranty, and were held by the Ives Manufacturing Company.   The contract of guaranty was that he should "endorse *all* notes made by T. F. Eigelberner & Co.," and when he executed the mortgage, he knew that he had endorsed the notes pursuant to said guaranty, and instead, therefore, of only securing the performance of the covenant for the endorsment of the notes, it secures the payment of the notes not *to be held* by the Ives Manufacturing Company, but all such as the said Company *held* at the time of this mortgage.   This was an admission by Myers that the notes were endorsed by him pursuant to said contract.   *Hartwell vs. Blocker,* 6 *Ala.,* 581.

The mortgage recites that it is for the performance of the agreements contained in the contract of guaranty,

*and also* as collateral security for the payment as stipulated by said contract of any and all notes, drafts, &c., signed or endorsed by said A. J. Myers, and *held, owned* or negotiated by said company. The intention to secure *all* notes endorsed by Myers, and then held, owned or negotiated, is still further manifest in the defeasance and the provision for sale upon default, contained in said mortgage. The clear and manifest intention as therein shown and expressed, is that *all notes* endorsed by said Myers, and *held,* owned or negotiated by said Ives Manufacturing Company, should be covered by said mortgage. No other construction would satisfy the terms of said mortgage, for none other would give effect to all parts of the paper, which Courts will always do. *Addison on Cont., sec.* 220.

But it is contended by the petitioner that the funds of the estate of Edward Griffith were invested in this land, and that the mortgage having been given to secure an antecedent indebtedness, the mortgagee stands in the position of a volunteer, and takes subject to the prior equities which he claims to represent.

Now, it is a clearly established principle in equity jurisprudence, that whenever a trustee has been guilty of a breach of trust and has transferred the property, by sale or otherwise, to any third person, the *cestui que trust* has a full right to follow such property into the hands of such third person, unless he stands in the predicament of a *bona fide* purchaser for a valuable consideration, without notice ; and if the trustee has invested the trust property, or its proceeds, in any other property into which it can be *distinctly* traced, the *cestui que trust* has his election either to follow the same into the new investment or to hold the trustee personally liable therefor. *Perry on Trusts, sec.* 835 ; *Oliver vs. Piatt,* 3 *Howard,* 333, (401.)

The proof must be clear that it is trust money that has been invested in the land, as it is the character of the funds in such a case that creates and attaches the trust to the land.

34                    v. 47.

---

---

*Smith vs. Burnham*, 3 *Sumn.*, 435, (462) ; *Sugden on Vend.*, *m. p.* 708, and authorities cited in *notes a* 1, *a* 2.

And this case being the establishment of a resulting trust, the fact of the investment of the money in the property should be ·proved by · *convincing* proof. *Greer vs. Baughman*, 13 *Md.*, 257.

Before, then, the petitioner in this case could acquire any standing in a Court of equity to set up a prior equity against the claim of the Ives Manufacturing Company, he was bound to prove clearly that *the money belonging to the trust estate of which he is the trustee had been invested by Myers in the land mentioned in the mortgage*, and upon his failure so to do, his petition should have been dismissed. The only evidence offered by the petitioner to prove the investment of the trust funds in *this particular property* was a copy of the record in the case of *Andrew J. Myers, et al. vs. Henry S.·Myers, et al.*, in the Circuit Court for Baltimore County, and the testimony of Thomas M. Lanahan to prove the same proceedings, to both of which exceptions were filed by the complainants in the Court below.   But supposing the record to be admissible, it could only be so for the purpose of showing the appointment of Suter as trustee, but it could not prove that Myers had invested trust funds in the lot on Monument and Washington streets.   The said lot is mentioned but once in the whole record, and that is an exhibit filed by Myers with his answer, on the 28th day of March, 1876, after the mortgage in this case was made.   In his letter of December 24th, 1875, before the date of the mortgage, he had represented said property as not belonging to the trust, but as his individual property.   The character of the fund which Myers paid for this land is not shown in the testimony, and therefore no trust attaches to the land.

But the proceedings were inadmissible for the purpose of proving any fact in this case which was established in the proceedings in that cause. *Dorsey vs. Gassaway*, 2 *H. & J.*, 402.

And there was, therefore, an entire absence of evidence to support the equity set up by the petitioner.

3. But if the fact had been proven that the funds of the trust estate were invested in the mortgaged property, it could not affect the claim of the Ives Manufacturing Company without proof that it had notice of the fact, if it was a purchaser or mortgagee in good faith and for a valuable consideration, without notice; for it is plain that such a purchaser or mortgagee is not bound by antecedent equities.

It has been variously decided whether a purchaser or mortgagee who takes a grant or a mortgage to secure an antecedent indebtedness is such a purchaser or mortgagee.

In this State, however, it is settled that when such a grant or mortgage is given and accepted in *satisfaction* of such antecedent indebtedness, then such a purchaser or mortgagee is one for a valuable consideration and is protected against prior equities. *Busey vs. Reese*, 38 *Md.*, 264.

But it is still an open question in this State whether a grant or mortgage given and accepted as collateral security for an antecedent debt, will make the purchaser or mortgagee a purchaser or mortgagee for a valuable consideration, and in good faith, so as to defeat prior equities. The weight of authority outside of this State seems to be that such a purchaser or mortgagee is not one for a valuable consideration, and is not, therefore, protected against antecedent equities. 2 *Leading Cases in Equity*, 104. Though in some of the States it has been held otherwise. *Babcock vs Jordan*, 16 *Indiana*, 21; *Work vs. Brayton*, 5 *Indiana*, 396; *Cooley vs. Hobart*, 8 *Iowa*, 358.

It is, however, clearly settled, that if the goods are sold and the advances are made upon the faith of an agreement that the payment thereof shall be secured by a mortgage upon real or personal property, as collateral security,

then such a purchaser or mortgagee is one in good faith and for a valuable consideration, and is protected as such, although such mortgage is not executed until after the payment or advance of the money or delivery of the property. *Phillips vs. Crammond,* 2 *Wash. C. C. Rep.,* 441, (447;) *Gatteman vs. Homer,* 12 *Nat. Bank Rep.,* 493; *Cole vs. Albers,* 1 *Gill,* 416, (422;) *Block vs. Chase,* 15 *Mo.,* 344; *Fenby vs. Pritchard,* 2 *Sandf. Sup. Ct.,* 157.

4. But if the petitioner has a sufficient standing in Court to assert the equities alleged by him, and the Ives Manufacturing Company is subject to these equities, he can claim nothing except the $10,000 invested in the said property, and the complainant was therefore entitled to have the property sold, and if any of the proceeds remained after the payment of that part of its claim, which is allowed to have priority over the trust claim, and of the amount of the trust claim, then to have the balance of its claim satisfied thereout. *Perry on Trusts, sec.* 842, and authorities cited in *n.* 9; *Hopper vs. Conyers, L. R.,* 2 *Eq.,* 549.

5. But even if the Court below was right in its construction of the mortgage, the auditor's accounts were erroneous in allowing the amount due by Ives Manufacturing Company to Eigelberner & Co., amounting to $432.12, and also a part of the payment made by the assignee in bankruptcy, amounting to $510, as credits on the items of the account, bearing date since the first day of January, 1876. As these were payments made generally on account, they should have been applied to the extinguishment of the oldest items in the account. *Neidig vs. Whiteford,* 29 *Md.,* 178; *Heise vs. Evan,* 44 *Md.,* 470.

*T. M. Lanahan* and *Frank Gosnell,* for Suter.

Is the property covered by this mortgage responsible for any portion of this claim for goods furnished by the Ives Manufacturing Company to Eigelberner & Co.

If it belonged, legally and equitably, to Andrew J. Myers at the date of the mortgage, clearly it is responsible for all goods furnished under that contract; but if we shall be able to show that the property did not belong to him at that time, and never did, and that in the use of it he was committing a fraud upon his *cestuis que trust,* and that the mortgagees did not part with their merchandise upon the faith of the mortgage, but were bound to furnish them under the contract of October 23rd, 1875, then we apprehend there can be no difficulty in exempting this property from all liability.

The petition of Mary F. Myers, asking the trustee under her father's will for an account of the trust estate to which she and her children were entitled, and which had been confided to A. J. Myers, as trustee, by the Circuit Court for Baltimore County, in Equity, Myers' answer in which he mentions this particular property as purchased with the trust funds, the decree of the Circuit Court of Baltimore County, the testimony of T. M. Lanahan, and the petition of Suter, trustee, all conclusively show that the property described in the mortgage was the trust property covered by the decree of the Circuit Court for Baltimore County, and belonged to Mrs. Myers and her children, under the will of Edward Griffith.

Now it being established that this property, although fraudulently standing in the name of Myers, belonged to the devisees of Edward Griffith, did the complainants acquire a lien upon it in such a manner as would constitute them *bona fide purchasers for a valuable consideration?* What value did they give, or what did they part with for this mortgage? Under the contract of the 23rd of October, 1875, they were bound to furnish the merchandise there stipulated upon the simple guaranty or endorsement of Myers, and not one word was mentioned at the time in the contract about a mortgage.

It is true, previous to the execution of the contract, the complainants had asked Myers for a mortgage, but he

wholly, at that time, refused it, and five-sixths of the merchandise was purchased before the mortgage was given.

It was then but simply a voluntary act of Myers to accommodate Ives that caused this mortgage to be subsequently executed. The account filed by the complainants shows that they dealt with and trusted Eigelberner & Co. as early as first of June, 1875, five months before even the contract of October, 1875, was thought of, much less the mortgage, which was not executed until the 24th of January, 1876, and recorded 27th of January, 1876.

But again, if this Court should determine that the property under the mortgage is not entirely exempt from liability, we will contend, that under the law, when applied to the facts in the case, the utmost extent of its liability is for the merchandise furnished subsequent to the execution and delivery of the mortgage, which was on the 27th of January, 1876. And in support of these several positions, we refer to the following authorities. *Powell vs. Bradlee,* 9 *G. & J.,* 278 ; *Ratcliffe vs. Sangston,* 18 *Md.,* 383 ; *Root vs. French,* 13 *Wendell,* 574 ; *Beavers vs. Lane,* 6 *Duer,* 233.

" The rule may be safely stated that no one is a *bona fide* purchaser in the sense now proposed, *who has neither advanced money nor property, nor incurred liabilities upon the faith of his vendor's apparent title, and without any apparent defect therein;* and by liabilities is meant those obligations from which the retaking by the former and true owner will not of itself relieve him. If in such retaking, he will be in all respects in the same condition as if he had made no such contract of purchase, he is not a *bona fide* purchaser, having title paramount to that of the true owner." *Beavers vs. Lane,* 6 *Duer,* 240.

In the case of *Powell and Bradley* it was said :

" We think the Court below erred in telling the jury that the plaintiffs would, nevertheless, acquire a good title by the bill of lading, if they became creditors subsequent to

the delivery of the goods to the fraudulent vendees (of which fact there was not a particle of proof,) *and without adding* that they became such creditors, *bona fide, upon the faith of the consignment and shipment of those very goods.* In such case good faith and a valuable consideration would be essential constituents of a good title in any person claiming under them." *Powell, et al. vs. Bradlee & Co.,* 9 *G. & J.,* 278.

So in the case of *Ratcliffe vs. Sangston,* 18 *Md.,* 383, it is held that an assignment of goods by a fraudulent vendee, for the benefit of his creditors, in consideration of a *pre-existing indebtedness,* confers no title as against the defrauded vendor, who may avoid the sale and recover the goods from the assignee, who has no notice of the fraud, such assignee is not a purchaser for a valuable consideration.

So where a fraudulent vendee in the assignment from him of the goods in question, recited the fact that A. B. had endorsed and become responsible for him on divers promissory notes and responsibilities to the amount of $1921, and in consideration of the said sum of $1921, he made the assignment, the Court held that such assignee was not such a *bona fide* purchaser as barred the title of the rightful owner, adding that to have constituted a sufficient consideration, such person must have given *value* for the property, or *incurred some responsibility* upon the credit of it (and without notice of the fraud,) or in making advances upon it, or receiving it in pledge for money or property loaned upon it, *but the payment of, or security for a pre-existing debt, would not be a sufficient consideration. Root vs. French,* 13 *Wendell,* 570. Therefore it will be contended—

I. That the mortgage in this case—the consideration for the same being a *pre-existing indebtedness*—is void as to this trustee and his *cestuis que trust,* and the property thereby conveyed is in no way responsible *for any lia-*

*bility incurred* by reason of goods furnished to Eigelberner & Co. under the contract and guaranty of October 23rd, 1875, in this case—the shipment of goods to that firm *not being upon the faith of said mortgage.*

II. If the mortgaged property is at all liable, it can only be for goods furnished *upon the faith of the same,* and on and subsequent to January 27, 1876, the date of its delivery.

MILLER, J., delivered the opinion of the Court.

By a mortgage dated the 14th of January, 1876, Andrew J. Myers and his wife, conveyed a lot of ground and premises located on Monument street, in the City of Baltimore, to the Ives Manufacturing Company of Medina, in the State of New York, as collateral security for certain undertakings therein specified, and the main questions presented by the cross-appeals in this case are, 1st, is the mortgaged property responsible to any extent for these engagements? and 2nd, if so, to what extent? These we shall consider in their order.

1st. The claim for total exemption arises in this way. It appears that by a decree of the Circuit Court for Baltimore County, passed in 1860, in a proper proceeding for that purpose, Myers was appointed trustee to execute the trusts created by the will of Edward Griffith, who had died in 1853. This appointment was made in consequence of the death of one, and resignation of the other of the executors and trustees named in the will. The principal beneficiaries and *cestuis que trust* under the will were Mrs. Myers, a daughter of the testator, and her children. Under this appointment, Myers received into his possession, and had charge of a very large estate consisting of real and personal property, with power of sale and investment and re-investment for the benefit of his wife and children, and continued in charge thereof until March, 1876. On the 14th of March, of that year, Mrs. Myers, by her next friend, filed a petition

in that cause, stating that she had reason to believe that a very large portion of the estate had been lost and wasted by her husband, and praying that he should be required to report an account for the money and property he had so received, and to state what disposition he had made of it, and that a new trustee be appointed in his place.   Myers answered this petition admitting its averments as to the loss to the estate by his management thereof, and with his answer, filed a report stating what he had received, and what investment and disposition he had made of the trust funds.   The Court thereupon on the 28th of March, 1876, passed a decree removing him from the trust, and appointing Edward P. Suter, trustee in his place, with power and authority to recover all the trust property wasted or misapplied or improperly used or appropriated by Myers, and for that purpose he was directed to institute at once all necessary legal proceedings.

Mr. Suter, the trustee, now insists that though the title to this Monument Street property stood in Myers' individual name, yet it was in fact purchased with these trust funds and cannot therefore be sold to satisfy any of the obligations secured by the mortgage.   This equity is relied on in a case wherein the mortgagee is seeking to enforce the mortgage, and of course the first step to be taken by the trustee who sets it up is to establish by clear and satisfactory proof that the money belonging to the trust estate has been invested by Myers in this property.   If there is a failure of proof on this point it is needless to inquire whether there are any other valid objections to the claim. The only proof adduced by the trustee in support of this position is a statement made by Myers in the report accompanying his answer to his wife's petition in the Baltimore County case, to the effect that he had invested $10,000 cash, belonging to the trust estate, in this property. But assuming (without so deciding) that this statement contained in that record, can be admitted as evidence

against the mortgagee in this case, it is fully met and its effect destroyed by the letter of Myers produced on the other side, dated the 24th of December, 1875. In that letter, written to the company (the mortgagee) to quiet their apprehensions and to assure them of his ability to meet his obligations, he sets out an itemised statement of real, and personal property, including this Monument street lot and premises, which he values at $20,000, which he held in his own name, and adds, " this does *not include* the property of seventy or eighty thousand dollars *for which I am trustee.*" This is an explicit and positive assertion of individual ownership by the same party of this same property, and that being the state of proof on this subject, it is plain the tracing of the trust funds into this property has not been made out by such proof as the law requires.

2nd. The extent of liability depends upon the construction of the mortgage itself. It is shown by the record that a son of Mr. Myers was a member of the firm of Eigelberner & Co., doing business in Baltimore. This firm was engaged in the sale of plumbers' hardware and materials, and the Ives Company were manufacturers of such articles. On the 23rd of October, 1875, this firm and company entered into a lengthy written contract, the terms of which need not be stated at length. It is sufficient to say that by this contract, the company engaged to supply the firm with certain manufactured articles specially described, in specified quantities, and at specified prices, which the firm agreed to pay for, and to give their notes endorsed by Myers, for the amounts found due upon monthly settlements ; and by a clause expressed in very plain language, it was mutually stipulated " that this agreement shall be, and remain in full force for the period of five years *from the first day of January*, 1876." At the same time, Myers by a written contract under seal, endorsed on or appended to this agreement, engaged to

guarantee the performance of their part of the agreement by the firm, and the payment by them to the company, " of all sums which may hereafter become due to them *under the provisions of this agreement*," and to endorse " all notes made by the firm to the company *pursuant to the aforegoing agreement.*" Afterwards, on the 14th of January, 1876, Myers and wife gave to the company the mortgage in question, the recitals in which plainly set forth the purpose for which it was executed, and the intention of the parties in giving and receiving it. These recitals are to the effect that " whereas the said Myers in pursuance of the terms of a certain agreement or contract entered into by him with said company, (which agreement is annexed to a contract entered into between the said company and the firm of Eigelberner & Co., on the 23rd of October, 1875,) did agree to execute this mortgage as a continuing collateral security, (to be limited in amount to the sum of $20,000,) for the performance on his part of the said contract between him and the company, and also as collateral security for the payment *as stipulated by said contract* of any and all notes, drafts, acceptances or other obligations signed or endorsed by him, and held, owned or negotiated by the said company," and " in consideration of the premises," the conveyance is made. There is nothing in the defeasance clause, or in any other part of the instrument giving it any broader scope, or authorizing any broader construction to be placed upon it, than what is stated in these recitals. From these, it plainly appears to have been given as *collateral security for the guaranty* of Myers, endorsed on the contract of the 23rd of October, 1875. It so clearly refers to this guaranty and contract, that both of them, for the purpose of construction, are to be read in connection with it, and as if incorporated into it so as to form one instrument. The guaranty which the mortgage secures is, by its terms, confined to the stipulations of the contract, and as the latter was not to take

effect until the 1st of January, 1876, it follows that the mortgage covers only the dealings between the firm and the company, which took place under the contract *after that date,* and does not extend to any antecedent business transaction between the same parties. The record shows there had been such antecedent dealings, and that Myers had endorsed or signed the notes of the firm given for merchandise previously sold to them by the company, but these, according to the construction we have given it, are not secured by the mortgage. We are therefore clearly of opinion the Circuit Court was right in thus limiting the extent of liability to which the mortgaged property is to be subjected.

The remaining question is, has the auditor properly stated the amount of such liability, in the account which the Court has ratified. He has charged the mortgage with the aggregate amount of purchases made by the firm from the company after the 1st of January, 1876, until the dealings under the contract ceased. To this, no valid objection can be made. He has then credited this amount with the sum of $288.89, for profits due the firm on goods shipped to other parties through their orders, and also with the sum of $102.37, for freight paid by the firm on goods shipped to them after January 1st, 1876. These credits are in accordance with the terms of the contract, and are all shown by the proof to relate to transactions since the contract went into effect. They are not payments *of money* on account, so as to fall within the doctrine requiring them to be applied to the antecedent unsecured indebtedness, or to the first items of debit in the account, but credits growing out of and springing from the contract itself, and in our judgment were properly allowed. He has also allowed a credit of $40.86 for merchandise returned. To this we see no objection. It is allowed as a credit to the firm in the company's own account, and as of the 1st of January, 1876. The remain-

ing credit of $516.58, is for the proper proportion of the dividend received by the company on their whole claim from the assignee in bankruptcy of the firm. It appears that the company filed in the proceedings in bankruptcy, their whole claim, including what was due them by the firm before as well as subsequent to the 1st of January, 1876, and received thereon the sum of $1409.92, as a dividend on the 27th of February, 1877, after the first auditor's account had been stated in accordance with the opinion of the Court construing the mortgage, but before it had been ratified. In this state of the case, and as between the parties to this mortgage, it is, we think, just and right that a proper proportion of this sum should be applied in exoneration of the obligations to which the mortgaged property is subjected, and in so deciding, we in no wise disturb the general doctrine of application of payments as settled by previous decisions. We also think there was no error in the refusal of the auditor to charge the mortgage with half commissions to the trustee appointed to sell, and the costs of advertising the property. The proof does not show that any note or other obligation given by Myers under the mortgage, as we have construed it, had matured at the time of the advertisement, or that any indebtedness by the firm to the company under the contract had then matured and remained unpaid. For these reasons we find no error in the order appealed from, and it must therefore be affirmed, and the cause remanded.

*Order affirmed, and*
*cause remanded.*

(Decided February 20th, 1878.)